Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/16/2022 09:08 AM CDT

STATE OF NEBRASKA, APPELLEE,
v. ROY L. ELLIS, APPELLANT.

___ N.W.2d ___

Filed June 24, 2022.    No. S-21-595.

1. **Postconviction: Evidence: Witnesses: Appeal and Error.** In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. An appellate court upholds the trial court's findings unless they are clearly erroneous.

2. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.

3. **Postconviction: Constitutional Law.** Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.

4. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

5. ____: ____. To show that counsel's performance was deficient under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area.

6. **Effectiveness of Counsel: Proof: Words and Phrases: Appeal and Error.** To show prejudice under the prejudice component of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

7. **Effectiveness of Counsel: Proof.** A court may examine the two prongs of the ineffective assistance of counsel test, deficient performance and prejudice, in any order and need not examine both prongs if a defendant fails to demonstrate either.

Appeal from the District Court for Douglas County: Gregory M. Schatz, Judge. Affirmed.

James J. Regan for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith, Senior Assistant Attorney General, for appellee.

Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Doyle and Dobrovolny, District Judges.

Papik, J.

Roy L. Ellis, who has been sentenced to death for first degree murder, appeals the order that denied him postconviction relief following an evidentiary hearing. He claims that his trial attorneys were ineffective in challenging the admissibility and weight of DNA evidence presented at his jury trial. His arguments focus on the probability statistic provided with that evidence. Unpersuaded, we affirm.

## BACKGROUND

*Trial and Sentence.*

In 2005, 12-year-old Amber Harris disappeared after exiting her schoolbus. Harris' bookbag was later found in a

trash bin behind a boarding house where Ellis had lived before Harris' disappearance. Among other objects linked to Harris, the bookbag contained Harris' jeans, which had Harris' blood on them. DNA in a shape resembling a handprint was later detected on the jeans, in a mixture from which Ellis could not be excluded as a contributor. Months after Harris disappeared, her decomposed and partially clothed body was discovered in a secluded area. Harris had died from blunt force trauma to the head. In the months before the DNA evidence and Harris' body were found, Ellis had made a variety of incriminating statements to several individuals. Ellis was charged with first degree murder on theories of both premeditated murder and felony murder, for which the predicate felony was sexual assault.

Ellis was represented by appointed counsel, William Patrick Dunn and Jerry M. Hug. Prior to trial, Dunn filed a motion in limine in an attempt to exclude the DNA evidence gleaned from Harris' jeans. The motion generally challenged the theory of PCR-STR DNA testing that was applied in this case, based on the framework in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). At a hearing on the motion, the State, which had the burden of proof, presented the testimony of two DNA experts who were involved in processing and analyzing the DNA sample in Ellis' case, Kaye Shepard and Dr. James Wisecarver. Defense counsel's cross-examination addressed whether the DNA laboratory was properly accredited and whether accepted procedures were properly followed. Defense counsel did not present any evidence. The district court overruled the motion in limine.

The DNA evidence was presented at Ellis' jury trial over his general foundational objection. We recounted that evidence in our opinion on direct appeal:

The State's witness, . . . Wisecarver, explained generally that the testing process used in this case involved looking at 16 different genetic markers scattered throughout the genome at different loci. One of those is a sex marker that identifies the gender of the contributor; the other 15 are used to compare to known reference samples (in this case, for [Harris] and Ellis) to see if they are the same or different.

The DNA found on [Harris'] jeans was a mixture of DNA from at least two people, one of whom was male. Wisecarver explained that it was not possible to separate the mixture into a major and minor contributor at each locus. Instead, he said, the presence of the mixture was taken into account when calculating the likelihood that any other person would have any combination of the genetic markers that had been identified. Wisecarver explained that the purpose of the statistical calculations was to determine the likelihood that "we're going to find somebody, anybody, that could have any of these markers in any combination." In other words, Wisecarver said, when testing a mixture, "[w]e make no inferences as to who matches up with whom in there. We just want to say in all the populations how many people would we have to screen in order to find somebody, anybody, that would fit in here in any combination of those."

Given that [Harris'] genetic profile was known, Wisecarver testified that only 1 in 2.3 billion people would be expected to "plug in" as the other contributor to the mixture. And despite those odds, Ellis could not be excluded as a contributor to the mixture.

On cross-examination, Wisecarver was asked about what happened when two samples had common alleles—in other words, when the two possible contributors to the mixture were genetically identical at a tested locus. Wisecarver conceded that when such a common genetic marker was found at a locus, in this case, it

was not possible to tell who had contributed the allele. But, Wisecarver said, it was still scientifically appropriate to consider such a locus when making statistical calculations.

*State v. Ellis*, 281 Neb. 571, 585, 799 N.W.2d 267, 284-85 (2011).

On redirect, Wisecarver further explained the "uniqueness or rareness" of the probability statistic linking Ellis to the crime:

[T]he population of the planet Earth is known to be approximately 6.6 billion people. So based on that, the odds that — the likelihood we would find — if we look at the population of the planet Earth, we would maybe find two other people in addition to [Harris] and . . . Ellis who could have contributed to this mixture based on our known frequencies.

Ellis' counsel did not object.

Shepard also testified for the State. She explained on cross-examination by Ellis' counsel that the statistical analysis garnered from DNA testing was a tool for attorneys and jurors to determine how important the results were. She acknowledged that her laboratory had generated statistics that were "bigger" than the 1 in 2.3 billion generated in this case. When Ellis' counsel posited to her that it was "not a staggering number . . . given the work you do," Shepard replied, "It's a pretty large number to me."

In addition to the DNA evidence, the State presented evidence of the incriminating statements Ellis made while incarcerated on unrelated charges and before the DNA evidence and Harris' body were discovered. He repeatedly asked former neighbors about any activity at the boarding house, but after Harris' possessions were found, these inquiries stopped, though Ellis' communication with the neighbors did not. A corrections officer reported that Ellis asked him for information about Harris' case and books on forensics and DNA examination and that Ellis asked questions about fingerprint identification, decomposition of buried bodies, and

contamination of blood and semen left outside. Ellis asked another corrections officer how long semen would last inside a dead body in a rural forested area and asked the corrections officer to do internet research on the subject. Ellis posed similar questions about semen and decomposition to other inmates. An inmate heard Ellis say that he had previously taken women to the area where Harris' body was ultimately found and sexually assaulted them, hitting them on the head if they did not comply. Ellis told another inmate that he had sexually molested underage girls, some of them in the same area. The same inmate said that Ellis expressed an unusual interest in Harris' case and cut out newspaper articles about it. Ellis told yet another inmate that he had sexually assaulted and strangled a young girl. When one inmate remarked that it was "crazy what happened to that Amber Harris girl," Ellis said, "that's why I got to get out and cover my tracks." Two inmates said Ellis admitted to sexually assaulting Harris and striking her in the head; according to one of those inmates, Ellis said he hit Harris in the head with a hammer.

The State also presented other circumstantial evidence and evidence that Ellis had sexually assaulted his former stepdaughters when they were between 12 and 15 years old.

The jury found Ellis guilty of first degree murder, and he was sentenced to death.

*Direct Appeal.*

Represented by the same counsel, Ellis appealed his conviction and sentence, and we affirmed. See *State v. Ellis, supra.* Relevant here, we concluded that the district court did not err in admitting the DNA evidence over Ellis' motion in limine:

Ellis does not contend that the State's witnesses were not qualified to testify, or that their basic reasoning and methodology was not reliable. Rather, Ellis contends that under our *Daubert/Schafersman* framework, that methodology was not properly applied in this case. . . .

Ellis' appellate argument is focused on the use of common alleles in the State's statistical analysis. Ellis

contends that the "overriding issue" with that method is that "where there is uncertainty as to the contributor, as long as the suspect is 'fully represented' . . . then that location counts against the suspect in calculating the possibility of exclusion." This, according to Ellis, "is fundamentally unduly prejudicial and should not have been allowed."

Ellis cites no authority that is specifically relevant to the issue he raises, nor is it clear that he raised that issue in the trial court. It was not addressed in his pretrial motion, which was addressed generally at the theory of PCR-STR DNA testing that was applied in this case. Nor did he raise it at trial beyond a general foundational objection, which is insufficient to preserve a *Daubert/Schafersman* issue. . . . Ellis' pretrial motion should have identified what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case. But the issue now raised by Ellis was not identified then.

Furthermore, Ellis' argument rests upon a misunderstanding of the way in which the DNA statistics were calculated. As Wisecarver explained, the purpose of examining each locus is to determine two things: (1) whether the contributor of the reference sample can be excluded as a contributor and (2) how commonly one might expect the profile that is generated to occur randomly in the population. In other words, the initial question was not whether the alleles that were found at each locus identified Ellis as the contributor; instead, it was whether the testing excluded Ellis as a possible contributor. And obviously, an allele that could be found in both Ellis' and [Harris'] genetic profile would not exclude Ellis as a possible contributor.

On the second step, the fact that the DNA sample was a mixture clearly affected the calculation of how many

people might be expected to have genetic profiles consistent with the sample, which is presumably why the probabilities found in this case are relatively modest compared to others. While 1 in 2.3 billion people might seem like a daunting figure, other cases involving single-contributor or major-contributor samples have produced probabilities of 1 in several quintillion. But that goes to the weight of the evidence, not its admissibility—in fact, Ellis explored that issue on cross-examination of one of the State's experts. The district court did not abuse its discretion in concluding that the DNA evidence was admissible, and we find no merit to Ellis' assignment of error.

*State v. Ellis*, 281 Neb. 571, 586-88, 799 N.W.2d 267, 285-86 (2011) (emphasis omitted).

We also determined that the trial court had abused its discretion in admitting prior bad acts evidence that Ellis had sexually abused his former stepdaughters, but given the strength of the State's other evidence, including the DNA evidence, we concluded that the erroneously admitted evidence was harmless:

We recognize that the admission of other acts evidence, by its nature, is usually prejudicial to the defendant. But this is the rare instance in which it was not. For one thing, [one witness] testified, without objection, that Ellis admitted molesting young girls and impregnating his stepdaughter. And more fundamentally, Ellis was inescapably tied to [Harris'] killing through DNA evidence that . . . was admissible and persuasive, and physical evidence that proved to be consistent with Ellis' careless statements that had already been reported to investigators. There was no innocent explanation for how Ellis' DNA came to be on [Harris'] bloody clothing. Nor is there any innocent explanation for how several witnesses came forward with information before [Harris'] body or Ellis' DNA on her clothing had been discovered linking Ellis to the killing—some of whom even accurately

described [Harris'] cause of death and the possible loca-
tion of her body. This evidence can only be explained by
the conclusion that Ellis was the killer.

Given Ellis' statements, the physical evidence, and the
other circumstantial evidence, we have no doubt that any
reasonable trier of fact would have found Ellis guilty of
the charge against him. In particular, no reasonable trier
of fact could overlook the testimony of [three witnesses],
each of whom was interviewed several weeks before
Ellis' DNA was identified on [Harris'] clothing and at
least a month before [Harris'] body was found . . . . Each
witness found Ellis' interest in the case suspicious, and
they all described details of the case that they had no way
of knowing unless they heard them from the person who
killed [Harris].

*Id.* at 581-82, 799 N.W.2d at 282-83 (emphasis omitted).

*Postconviction Motions and*
*Evidentiary Hearing.*

In 2011, Ellis filed a timely pro se motion for postconvic-
tion relief, which was subsequently amended by Ellis and later
by new counsel. Among other things, the motions alleged that
Ellis' trial counsel had been ineffective in challenging the
State's DNA evidence. The district court allowed Ellis an evi-
dentiary hearing on the issue. At the hearing, the district court
received the deposition testimony of Ellis' former counsel,
Dunn and Hug.

Dunn testified that the probability statistics admitted at trial
were available at the time of the pretrial motion in limine.
Dunn stated that he had "seen much higher numbers" than
the probability statistics in Ellis' case. Dunn recalled he did
not raise the common allele argument in his pretrial motion to
exclude DNA evidence because the statistical calculations took
common alleles into account. Dunn retained a DNA expert,
Dr. Ron Ostrefski, after the hearing on the motion in limine
but prior to trial. Ostrefski did not conduct his own testing

and analysis, but examined the State's DNA evidence and did not express any concerns about the statistical probabilities it proffered. For this reason, Dunn explained that he did not call Ostrefski to testify at trial as a defense DNA expert. Asked whether there was a strategic purpose to making a general foundational objection at trial that did not preserve the admissibility issues raised before trial, Dunn testified that he did not view the point he was trying to make about the DNA evidence to be of "great evidentiary moment or any evidentiary moment." Dunn testified that using cross-examination at trial to address the effect of common alleles on the ability to generate a statistical probability was the best approach for the defense at the time, as was advancing the same theory in the context of admissibility on direct appeal.

Hug testified that Dunn took the lead on challenging the State's DNA evidence. Hug stated that if Ostrefski had disputed the State's probability statistics, they would have pursued the matter. But Hug recalled that he and Dunn had not come up with any realistic way to keep the DNA evidence from being admitted at trial. Thus, it was their strategy to try to minimize the importance of the evidence at trial, that is, its weight.

*Order Denying Postconviction Relief.*

The district court denied postconviction relief. It identified ineffective assistance claims pertaining to (1) the admissibility of the State's DNA evidence and (2) counsel's failure to retain a defense expert to testify about the weakness of the statistical analysis proffered by the State's expert.

Regarding admissibility of the State's DNA evidence, the district court found that trial counsel's performance throughout the proceedings was not ineffective. It observed that Ellis' counsel had extensively cross-examined the State's DNA experts at the hearing on the motion in limine and that Ostrefski, who defense counsel retained afterward, generally agreed with the accuracy of the DNA testing results. The district court further reasoned that defense counsel conducted

an extensive cross-examination that elicited Wisecarver's testimony that when a common genetic marker was found at a locus, it was not possible to tell who had contributed the allele, but that it was still scientifically appropriate to consider that locus when making statistical calculations. The district court concluded that on appeal, "Ellis was not prejudiced by counsel's failure to preserve the issue of his trial attorneys' failure to challenge the admissibility of the DNA evidence for appellate review because the DNA evidence was determined to be admissible on direct appeal."

The district court also found that Ellis had failed to show deficient performance and prejudice when defense counsel did not retain a DNA expert to assist in challenging the State's DNA evidence at the hearing on the motion in limine or present expert testimony challenging the State's statistical analysis. It stated that Ellis had not identified an expert who would have assisted defense counsel and offered no evidence as to what that expert's testimony would be. And the district court noted that Ostrefski had conceded that the State's statistical data was sound.

Ellis now appeals.

## ASSIGNMENTS OF ERROR

Ellis assigns, consolidated and restated, that the district court erred in not granting him postconviction relief based on his allegation that trial counsel was ineffective in challenging the State's DNA evidence.

## STANDARD OF REVIEW

[1] In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. An appellate court upholds the trial court's findings unless they are clearly erroneous. *State v. Newman*, 310 Neb. 463, 966 N.W.2d 860 (2021).

[2] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.* When

reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *Id.* With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Newman, supra.*

## ANALYSIS

[3] Ellis challenges the order that denied his request for postconviction relief. Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *Id.* In this case, Ellis alleges one such constitutional violation, ineffective assistance of counsel. See *id*. We understand his arguments to center on the probability statistic generated from the State's DNA evidence that implicated him in Harris' death, which we described as "relatively modest" compared to the probabilities in other cited cases. See *State v. Ellis*, 281 Neb. 571, 587, 799 N.W.2d 267, 286 (2011), citing *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009), *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007), *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004), and *State v. Fernando-Granados*, 268 Neb. 290, 682 N.W.2d 266 (2004). As we read Ellis' brief, he asserts that his trial counsel rendered ineffective assistance in not addressing the impact of this "relatively modest" probability statistic on the admissibility of the DNA evidence and, once it was admitted, on its probative value. See *id.* We are not convinced that Ellis is entitled to postconviction relief on either basis.

[4-7] The principles that govern here are well-established. To prevail on a claim of ineffective assistance of counsel under the two-pronged test in *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the

defendant's defense. See *State v. Newman, supra.* To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Newman, supra.* A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id.* "'The likelihood of a different result must be substantial, not just conceivable.'" *State v. Newman*, 310 Neb. 463, 472-73, 966 N.W.2d 860, 869 (2021), quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either. *State v. Newman, supra.*

We begin by considering whether trial counsel rendered ineffective assistance with respect to the admissibility of the State's DNA evidence. Ellis contends that his counsel should have opposed the admission of this evidence by addressing it in the pretrial motion and in a corresponding objection at trial based on the probability statistic's relative weight. Ellis also suggests that his counsel should have retained an expert to guide the defense in dealing with the impact of the probability statistic on admissibility. To argue that he was prejudiced by his trial attorneys' performance in this regard, Ellis places great emphasis on the role of the DNA evidence in this court's harmless error analysis on direct appeal.

We conclude that trial counsel did not perform deficiently when it did not challenge the admission of the DNA evidence based on the relative strength of the probability statistic. When reviewing claims of alleged ineffective assistance of counsel, strategic decisions made by trial counsel will not

be second-guessed so long as those decisions are reasonable. See *State v. Newman, supra*. See, also, *Harrington v. Richter, supra* (defense counsel entitled to formulate strategy that was reasonable at time and to balance limited resources with effective trial tactics and strategies). At the time the motion in limine was filed, Ellis' trial counsel was aware of the 1-in-2.3-billion probability statistic, a statistic that the expert retained by the defense later accepted. Ellis' trial counsel testified that, unable to find a realistic way to keep the DNA evidence from being admitted, the best approach was to minimize the impact of this evidence at trial by casting doubt on the use of common alleles to conduct the statistical analysis that generated the probability statistic.

We believe this admissibility strategy was reasonable, especially considering our holdings that DNA evidence will not be withheld from the jury simply because the probability statistics it provides are relatively low. See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). See, also, *State v. Tucker*, 301 Neb. 856, 920 N.W.2d 680 (2018). To the contrary, we have found jurors capable of assigning appropriate weight to "the statistical analysis that accompanies DNA evidence," even when the odds of a coincidental match are much greater than the odds expressed by the 1-in-2.3-billion probability statistic in this case. *State v. Bauldwin*, 283 Neb. at 703, 811 N.W.2d at 288 (rejecting claim that jury would treat probability of 1 in 500,000 same as 1 in septillion). See, also, *State v. Tucker, supra*. (1-in-1,842 chance of coincidental match did not render Y-STR DNA evidence unreliable so as to justify withholding it from jury). Given our prior decisions, we cannot say that trial counsel performed below the level of a lawyer with ordinary training and skill in this area of criminal law. Accordingly, Ellis has not satisfied the performance prong required to prove ineffective assistance of counsel in addressing the admissibility of DNA evidence.

Likewise, we conclude that once the probability statistic was admitted at trial, Ellis' trial attorneys were not

ineffective in their response. Ellis claims that his trial counsel should have retained an expert who could have guided the trial strategy and explained the weakness of the State's statistical analysis to the jury. Absent a defense expert, Ellis contends, his trial counsel should have simply pointed out that the statistical probability that Ellis was a contributor to the sample from Harris' jeans was "tens of thousands of times weaker than the DNA evidence typically admitted in criminal proceedings." Brief for appellant at 11. He further submits that his trial counsel performed deficiently in allowing Wisecarver to "equate the statistical probability to the number of people on [E]arth." Brief for appellant at 9. Ellis essentially argues that his trial counsel should have done more to put the probability statistic into proper perspective for the jury.

Again, rather than showing Ellis' trial attorneys' performance to be deficient, we find the evidence demonstrates it was a product of reasonable trial strategy. Attorneys in the position of Ellis' trial counsel could reasonably conclude that drawing additional attention to the probability statistic would not be to Ellis' advantage. After all, the odds that a random person other than Ellis was the contributor, "relatively modest" as they were, nonetheless served as "persuasive" evidence supporting the verdict. *State v. Ellis*, 281 Neb. 571, 581, 587, 799 N.W.2d 267, 282, 286 (2011). This was illustrated when trial counsel pursued the issue to some degree with Shepard, who explained that the jurors could weigh the probative value of the probability statistic and indicated that the probability statistic pointing to Ellis was, from her perspective, "a pretty large number." Not only did additional focus on the DNA probability statistic pose a downside risk to Ellis' case, we discern little that could have been gained by comparing the probability statistic in this case to other cases as Ellis contends his counsel should have done. It is not apparent to us why the jury would be moved by an argument that DNA evidence in unrelated cases showed more likely matches with the defendants in those cases. Given these factors, we

find it reasonable that Ellis' trial attorneys focused their efforts on diminishing the weight of the DNA evidence in the jury's eyes by questioning the common alleles upon which it was based.

Ellis does not explain how a defense expert could have improved upon this strategy or framed the probability statistic to Ellis' advantage, nor did he present any evidence on this point at the evidentiary hearing. Without specifying what such expert testimony would have been or who would have provided it, Ellis cannot establish that his trial attorneys were deficient for not retaining an expert to guide his defense or to testify.

Finally, although we find that Ellis has not succeeded in showing that his trial counsel performed deficiently in their treatment of the probability statistic admitted at trial, we also note that he cannot prove prejudice as to this point. Ellis does not explain—and, again, it is not apparent to us—why the jury would have discounted DNA evidence in this case just because there were probability statistics in other cases demonstrating a lesser likelihood of random matches with the defendants in those cases. And despite being "relatively modest" compared to some cases, the probability statistic here strongly suggested that Ellis' DNA was likely on Harris' jeans. See *State v. Ellis*, 281 Neb. at 587, 799 N.W.2d at 286. Considering this with the other circumstantial evidence that Ellis killed Harris, much of which we recounted above, we find there is not a substantial likelihood that the outcome would have been different had the probability statistic's relative strength been more overtly pointed out to the jury.

## CONCLUSION

Finding no merit to the errors alleged by Ellis, we affirm the order that denied him postconviction relief.

AFFIRMED.

HEAVICAN, C.J., and FREUDENBERG, J., not participating.