Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/25/2023 09:09 AM CDT

State of Nebraska, appellee, v.
Mabior M. Mabior, appellant.
___ N.W.2d ___

Filed August 25, 2023.    No. S-22-574.

1. **Appeal and Error.** Consideration of plain error occurs at the discretion of an appellate court.
2. ____. Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.
3. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.
4. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
5. **Effectiveness of Counsel: Records: Appeal and Error.** The record is sufficient to review a claim of ineffective assistance of counsel on direct appeal if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.
6. **Rules of Evidence: Other Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.

7. ____: ____. Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2022), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.

8. ____: ____. Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts. Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

9. **Evidence: Words and Phrases.** To be relevant, evidence must be probative and material. Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence. A fact is material if it is of consequence to the determination of the case.

10. **Rules of Evidence.** The fact that evidence is prejudicial is not enough to require exclusion under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under rule 403.

11. **Trial: Prosecuting Attorneys: Appeal and Error.** When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.

12. **Trial: Prosecuting Attorneys: Words and Phrases.** Prosecutorial misconduct encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.

13. **Trial: Prosecuting Attorneys: Juries.** A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.

14. **Trial: Prosecuting Attorneys: Appeal and Error.** If an appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.

15. **Trial: Prosecuting Attorneys: Due Process.** Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.

16. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

17. **Trial: Prosecuting Attorneys: Appeal and Error.** In determining whether a prosecutor's improper conduct prejudiced the defendant's

right to a fair trial, an appellate court considers the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction.

18. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

19. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. The determining factor is whether the record is sufficient to adequately review the question.

20. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense.

21. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

22. ____: ____. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

23. **Effectiveness of Counsel: Words and Phrases.** A reasonable probability of prejudice from ineffective assistance of counsel is a probability sufficient to undermine confidence in the outcome.

24. **Search and Seizure: Warrantless Searches.** Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications.

25. **Effectiveness of Counsel.** As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument to the trial court.

26. **Constitutional Law: Miranda Rights: Self-Incrimination.** The safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process. If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

27. **Confessions: Miranda Rights: Police Officers and Sheriffs.** Before the police are under a duty to cease an interrogation, the suspect's invocation of the right to cut off questioning must be unambiguous, unequivocal, or clear.

28. **Trial: Rules of Evidence: Police Officers and Sheriffs: Evidence: Extrajudicial Statements.** Statements by law enforcement officials on the veracity of the defendant or other witnesses, made within a recorded interview played for the jury at trial, are to be analyzed under the ordinary rules of evidence. Such commentary is not admissible to prove the truth of the matter asserted. However, it may be independently admissible for the purpose of providing necessary context to a defendant's statements in the interview which are themselves admissible.

29. **Hearsay: Words and Phrases.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

30. **Hearsay.** An out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.

31. **Trial: Evidence.** The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

32. **Witnesses.** The credibility of a witness is always relevant.

33. **Sentences: Probation and Parole.** A sentence of life imprisonment "without the possibility of parole" is erroneous, but not void.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed as modified.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Michael T. Hilgers, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

## I. INTRODUCTION

Mabior M. Mabior appeals his convictions in the district court for Douglas County, Nebraska, for two counts of first

degree murder and two counts of use of a firearm to commit a felony. Mabior's appeal focuses on the discovery of an extended magazine for a firearm and a receipt for an extended magazine and statements made in his interviews with police. Mabior also focuses on certain evidence admitted and on certain statements by the prosecution at trial, most notably including those regarding the prior shooting of one of the victims. Mabior's trial counsel did not move to suppress evidence of the extended magazine, the receipt, or Mabior's statements. With few exceptions, Mabior's trial counsel also did not object to the pertinent evidence and statements at trial or move for a mistrial or for a new trial. Accordingly, Mabior alleges plain error and ineffective assistance of trial counsel.

We find the record insufficient to address several of Mabior's claims of ineffective assistance of trial counsel but otherwise find no merit to his arguments on direct appeal. We agree with the State that the district court plainly erred in sentencing Mabior to "life without the possibility of parole," also stated as "[l]ife, with no parole," on each of his convictions for first degree murder and amend those sentences to life imprisonment consistent with Neb. Rev. Stat. §§ 28-105 and 28-303 (Cum. Supp. 2022). We affirm Mabior's convictions and his sentences as modified.

## II. BACKGROUND

Loklok Thok and Doup Deng were shot and killed near the intersection of 24th and Emmet Streets in Omaha, Nebraska, shortly before 3 a.m. on March 27, 2021. Projectiles removed from their bodies fit the characteristics of a 9-mm, .38-caliber, or .357-caliber firearm. A .45-caliber projectile was found in Thok's clothing.

At the scene, the Omaha Police Department (OPD) located multiple 9-mm casings stamped "BLAZER 9mm LUGER" and one .45-caliber casing stamped "SIG 45 AUTO." All the 9-mm casings were ultimately determined to have been fired from the same firearm, but police never recovered the firearms used in the shootings.

Police obtained a surveillance video from a school across the street from the scene of the shootings. The cameras were motion activated, and while there were three camera angles that cover the area of the shooting, none was "specifically targeted" to that spot. As relevant here, the video shows several people at the intersection of 24th and Emmet Streets shortly before 3 a.m. Seconds later, a person whom the parties agree was wearing red or orange outerwear stood over a person whom police later identified as Deng. Several flashes, similar to gunfire, appeared between that person and Deng. Then, that person bent over Deng. Thereafter, several persons ran toward a dark-colored vehicle that began moving. The person wearing red or orange outerwear was among those people, and the vehicle slowed down or stopped to pick that person up. No one else appeared to get into the vehicle after that person. The dark-colored vehicle then left the scene, followed by an apparently white vehicle.

Police also located a gray Dodge Charger "connected with" the residence where Thok, Deng, and Mabior attended a party prior to the shootings. This vehicle was eventually searched and found to contain a cell phone and wallet. The wallet held an identification card and credit cards in Mabior's name. The cell phone contained a photograph of a receipt for the purchase of an extended magazine for a 9-mm firearm by Mabior's girlfriend.

Police sought to locate Mabior for questioning. One officer surveilled a residence where it was believed that Mabior could be. The officer observed a black Chevy Cruze pull up to the residence and then leave shortly thereafter. The officer followed that vehicle and eventually stopped it for a traffic violation. Mabior was a passenger in the vehicle, and there was an extended magazine for a 9-mm firearm in a plastic bag on the passenger floorboard where Mabior was sitting. The magazine was ultimately determined to contain the same brand and caliber of ammunition as found at the scene.

Mabior was handcuffed and transported to an Omaha police station for an interview, which was recorded and later admitted into evidence at trial. After being given a *Miranda* warning and agreeing to speak with police, Mabior stated that Thok and Deng tried to "start[] stuff" with him at the party and had tried to fight him in the past. Mabior also stated that Thok was a "troublemaker" who was shot in Dallas, Texas, in 2019 after an incident with Mabior and Mabior's cousin. According to Mabior, his cousin fought Thok after Thok tried to hit Mabior; approximately 15 minutes later, Thok was shot as he "got into it" with other people.

In the interview, Mabior gave inconsistent accounts of the murders. Initially, he claimed that he left before the shootings. However, later, he variously stated that he was nearby and heard gunshots, but did not know who shot the victims; that he saw Goa Dat shoot the victims and leave the scene in a white vehicle with Goa Dat and Goa Dat's brother, Dilang Dat; and that Mabior "touched the bodies" while looking for a cell phone that he believed was stolen from him at the party.

Mabior was released after the interview. However, several hours later, police brought Mabior to the station for a second interview, which was also recorded and later admitted into evidence at trial. Mabior was again given a *Miranda* warning and agreed to speak with police. Early in the second interview, Mabior admitted that he confronted Thok in the street outside the party for taking his cell phone but claimed that he "let it be" before the victims were shot. Mabior also stated that he was the only one to pat down the victims, that the vehicle—which Mabior described as being white—had to stop so he could get in, and that Goa Dat and Dilang Dat were already in the vehicle when Mabior got in. In addition, Mabior stated that he first saw the extended magazine in the Chevy Cruze on the day of the traffic stop.

Approximately 2 hours into the second interview, a detective stated that Mabior seemed comfortable talking about some topics, but not others. Mabior then asked: "Know why

I'm not comfortable? . . . You said I had a firearm. That made me not want to talk no more." Shortly thereafter, the detective informed Mabior that he was "gonna have to talk" if he maintained that someone else killed Thok and Deng in his presence. The detective then asked Mabior what he was wearing at the time of the shootings. Mabior later said: "No. I'm just not talking anymore." The detective asked why, and Mabior said: "'Cause I be done. I'm done thinking about it. About everything you're saying." Some 15 minutes later, Mabior stated: "I just don't wanna talk no more." The detective asked Mabior why he no longer wanted to talk and why he was afraid to talk if he "didn't do anything." Mabior responded that he was not afraid to talk, and the interview continued from there.

At the conclusion of the interview, officers placed Mabior under arrest. The State subsequently charged him with two counts of first degree murder and two counts of use of a firearm to commit a felony. Mabior pled not guilty to the charges.

### 1. Motion to Exclude Evidence
### Regarding Prior Shooting

Prior to trial, Mabior moved to preclude the State from introducing evidence or eliciting testimony regarding his involvement in Thok's prior shooting, because his involvement in that crime was "propensity evidence" and "completely based on speculation." Mabior also argued that testimony about the prior shooting was irrelevant and more prejudicial than probative.

The State countered that people who attended the party with Mabior and the victims reported that he and the victims were arguing and attributed that argument to a "long-standing beef between [them]," which encompassed the prior shooting. The State argued that this "beef," or feud, was motive for the murders and that as such, the prior shooting was "inextricably intertwined into the story." The State also argued that there was no need to hold a hearing regarding the evidence of the prior shooting under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404

(Cum. Supp. 2022), because it was not adducing evidence that Mabior was the shooter.

The district court overruled Mabior's motion, reasoning that the issue of whether to exclude evidence regarding the prior shooting would be best addressed at trial. The district court also found that a rule 404 hearing was unnecessary, because the prior shooting is not being "directly attributed" to Mabior. However, the district court cautioned that the State "need[ed] to be careful" in presenting that evidence, including by ensuring foundation and lack of hearsay.

## 2. Pertinent Evidence at Trial

A jury trial was held. In addition to the background facts set forth above, the evidence at trial addressed other matters at issue in Mabior's appeal. That evidence is briefly summarized below as it relates to Mabior's assignments of error. Where relevant, additional facts will be noted later in the opinion.

### (a) Narration of Surveillance Video

The surveillance video described above was admitted into evidence and also played in open court. Several OPD officials testified regarding its contents. In one instance, a sergeant testified that Thok and Deng could be seen on the video at approximately 2:55 a.m. walking eastbound on Emmet Street from the residence where the party was held. The sergeant then testified that "[a person] wearing a red sweatshirt or sweater, later ID'd as . . . Mabior, was seen following [them]."

Mabior's counsel objected that the sergeant's testimony was speculative. The district court then asked the prosecution whether it "want[ed] to lay some foundation for that," at which point the prosecutor asked the sergeant, "Through the course of the investigation, you then go back and start assigning identities to people based on the information you gather[]?" The sergeant indicated that this was the practice and that he had "received information" that "the person [seen] in that video [was] likely Mabior." Mabior's trial counsel did not object to this testimony.

### (b) Videos of Mabior's Interviews
### With Officers

Recordings of Mabior's interviews with law enforcement were also admitted into evidence, and portions of them were played in open court. The recordings contained multiple instances where officers' interviewing Mabior stated that they believed he was lying about his involvement in the murders and that, in fact, he was guilty of the murders. Mabior's counsel did not request a hearing under *State v. Rocha*[1] to exclude law enforcement's statements or a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview.

### (c) Prior Shooting of Thok

At trial, an OPD officer testified about the course of the investigation. The officer stated that he first encountered Mabior's name when another officer informed him that Thok had been shot before. Mabior's counsel objected that the prior shooting was the subject of a motion in limine and that the State's question called for "rumor and innuendo about something that happened elsewhere and [has] no connection to this case." The prosecution withdrew the question, but Mabior's counsel did not move to strike the answer, move for a mistrial, or ask that the jury be instructed in any manner with respect to the answer. Subsequently, Mabior's counsel did not object to similar evidence, including testimony that the families of Thok and Deng "referenced" Mabior in connection with Thok's prior shooting.

### (d) Prosecution's Use of Term "We"

Multiple times during the trial, the prosecution used the term "we" in referring to law enforcement or the investigation. In one instance, after a detective indicated that a person was considered a witness, not a subject, in the investigation, the

---

[1] *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

prosecutor asked: "But at the time, we're executing a search warrant on his house, is that right?" A forensic technician was similarly asked whether an exhibit was one "we use . . . on a regular basis when you come in and help us testify." In addition, in closing arguments, the prosecutor stated, "The best explanation my detectives can give" for the shootings is that it was a dispute about a cell phone.

### (e) Victims' Text Messages

An OPD sergeant testified about text messages exchanged between Thok and Deng about the party. In the messages, Thok essentially assured Deng that they would be "'cool'" in going to the party without firearms because, in the sergeant's words, "'We ain't hanging out with African bros.' or 'Africans bro.'" Thok, Deng, and Mabior are all of Sudanese descent.

### (f) Mabior's Clothing on Night of Shooting

The detective who conducted Mabior's first interview testified about what officers did after that interview. The detective's testimony included a statement that officers decided to bring Mabior in for the second interview because after they released him, a person who attended the party with Mabior informed them that Mabior was wearing a red hoodie. This person testified at the trial but was not asked about Mabior's clothing on the night of the shootings.

### (g) One Shooter Who Went Through Victims' Pockets

The detective also testified that Dilang Dat told him there was one shooter who went through the victims' pockets. Dilang Dat did not testify at the trial.

### (h) Witness' Fear of Retaliation

A key witness for the State was the person who drove a black Honda Civic from the scene of the shooting. This witness testified that after she left the party, her boyfriend,

Dilang Dat, asked her to wait for him in the Honda Civic. She stated that as she was waiting, she heard "multiple gunshots" behind her and that "[it] all sounded like it was the same gun." She stated that she then looked back and saw several people running toward her car, that Dilang Dat got in first, that Goa Dat got in next, that Mabior got in after Goa Dat, and that no one got in after Mabior. She also testified that after Mabior got in, he "made a comment, like, 'They're gone, bro.'" The witness further testified that she did not recall what color clothing Mabior was wearing but that regardless of what color he was wearing, he was "the last person in [her] car."

In addition, the witness testified that she "worried about" potential consequences or retaliation if she came forward. She attributed her fear to her cultural background, because "in [the] Sudanese community," "snitching" is "very frowned upon." She stated that while she was not "threatened . . . in any manner personally" or told not to talk to police, Goa Dat and Dilang Dat "insinuated" or "led [her] to believe" that she should not talk to police.

### 3. Closing Arguments

In closing arguments, when discussing motive for the shootings, the prosecutor made the following statement:

> [Mabior] even tells us. He and [Thok] have had some beefs for a while. There's a bullet in [Thok's] rear end that was pulled out at his autopsy from a few years prior down in Dallas, Texas. [Mabior] was there, he tells [police] in his interview[,] "Yeah, we kind of got into it[]" and then about 15 minutes later, [Thok] gets shot a couple times.

### 4. Jury Verdict and Sentencing

The jury convicted Mabior of all four counts. Mabior was subsequently sentenced to consecutive sentences of "life without the possibility of parole," also stated as "[l]ife, with no parole," on each count of first degree murder and 15 to 30

years' imprisonment on each count of use of a firearm to commit a felony.

Mabior timely appealed. The appeal was placed on our docket because of the imposition of life imprisonment.[2]

## III. ASSIGNMENTS OF ERROR

Represented by different counsel on appeal, Mabior asserts as plain error, restated and reordered, that (1) all references to Thok's prior shooting should have been excluded on relevancy grounds or excluded under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), or under rule 404; (2) the prosecution committed misconduct by implying in closing arguments that Mabior was "responsible" for the prior shooting; and (3) the prosecution improperly aligned itself with law enforcement as the same body by vouching for law enforcement's credibility and for the investigation. Mabior also assigns that he received ineffective assistance of trial counsel.

The State did not cross-appeal but asserts as plain error that Mabior was sentenced to "life without the possibility of parole," also stated as "[l]ife, with no parole," rather than life imprisonment, for his convictions for first degree murder.

## IV. STANDARD OF REVIEW

[1,2] Consideration of plain error occurs at the discretion of an appellate court.[3] Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[4] Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur.[5]

---

[2] See Neb. Rev. Stat. § 24-1106(1) (Cum. Supp. 2022).

[3] *State v. Roth*, 311 Neb. 1007, 977 N.W.2d 221 (2022).

[4] *In re Estate of Koetter*, 312 Neb. 549, 980 N.W.2d 376 (2022).

[5] *Id*.

[3-5] Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.[6] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[7] The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[8] Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing.[9]

## V. ANALYSIS

### 1. Mabior's Assertions of Plain Error

#### (a) Admission of Evidence Regarding Thok's Prior Shooting

Mabior asserts that the admission of "[a]ny and all references" to Thok's prior shooting was plain error.[10] Mabior acknowledges that with one exception, he did not object to that evidence at trial. However, he now argues that this evidence was inadmissible under rule 404(2). He also includes in his assignments of error that the evidence was irrelevant and unfairly prejudicial. The State disagrees.

[6,7] We begin with rule 404, because most of the parties' arguments pertain to it. Under rule 404(2), evidence of other

---

[6] *State v. Johnson, ante* p. 20, 988 N.W.2d 159 (2023).

[7] *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[8] See *State v. Thomas*, 311 Neb. 989, 977 N.W.2d 258 (2022).

[9] *Id*.

[10] Brief for appellant at 59.

crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith.[11] However, rule 404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime.[12]

[8] Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime and evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts.[13] Evidence of other crimes or bad acts is also inextricably intertwined with the charged crime if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[14]

For example, in *State v. Burries*,[15] we rejected the defendant's argument that the district court erred in allowing the admission of evidence of his prior assault on the victim under rule 404(2) and as part of the res gestae of the crime. In so doing, we observed that while the district court found that the evidence of the prior assault was admissible under rule 404(2), we did not need to consider that ruling, because the "assault evidence was inextricably intertwined and not 404 evidence."[16] We based that conclusion on the fact that the assault was "part of the factual setting" of the subsequent murder, and the record supported the district court's conclusion that "evidence of the assault was necessary to present a coherent picture of the murder."[17]

---

[11] *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[12] *Id*.

[13] *Id*.

[14] *Id*.

[15] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[16] *Id*. at 406, 900 N.W.2d at 513.

[17] *Id*. at 405, 900 N.W.2d at 513.

Similarly, in *State v. Parnell*,[18] we affirmed the defendant's convictions after finding that evidence of his prior threat against one of the victims was inextricably intertwined with the charged crimes. The defendant argued that the evidence should have been excluded under rule 404(2).[19] We disagreed.[20] We concluded that evidence of the prior threat was "necessary to present a coherent picture of the shooting"; without that evidence, it would have appeared to the jury that the defendant randomly shot the victims.[21]

Here, as in *Burries*[22] and *Parnell*, the evidence of the prior shooting was not used to establish that Mabior had a propensity to shoot Thok and Deng. Instead, the evidence was used to establish that there was a "long-standing beef" between Mabior and Thok. As the State argues, evidence of that feud was necessary to paint a coherent picture of the shootings for the jurors; otherwise, they "would have been left with the impression that Mabior shot and killed Thok over just a missing cell phone when the reality was that tension had been building between them for some time."[23]

Because the evidence of Thok's prior shooting was inextricably intertwined with the present murders and thus was not rule 404 evidence, there is no merit to Mabior's argument that the State's admission at the hearing on the motion in limine that Mabior's cousin shot Thok in Dallas means that the State cannot make the necessary showing under rule 404(3) to introduce evidence of the prior shooting. Mabior is correct that rule 404(3) requires the prosecution to prove by clear and convincing evidence that the accused committed the crime, wrong, or act in order for evidence of another crime, wrong,

---

[18] *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016).

[19] *Id.*

[20] *Id.*

[21] *Id.* at 575, 883 N.W.2d at 670.

[22] *Burries, supra* note 15.

[23] Brief for appellee at 24.

or act to be admitted under rule 404(2). However, rule 404(3) has no application here, because the evidence of the prior shooting is not rule 404 evidence, as explained above.

[9] Evidence of Thok's prior shooting was also relevant and not unfairly prejudicial. To be relevant, evidence must be probative and material.[24] Evidence is probative if it has any tendency to make the existence of a fact more or less probable than it would be without the evidence.[25] A fact is material if it is of consequence to the determination of the case.[26] Here, the evidence was relevant for the reasons previously discussed to present a coherent picture of the murders.

[10] The same is true as to Mabior's claim that evidence of the prior shooting was unfairly prejudicial to him. The fact that evidence is prejudicial is not enough to require exclusion under rule 403, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under rule 403.[27] That is not the case here.[28]

Accordingly, we find no plain error in the admission of evidence regarding Thok's prior shooting. As we have previously explained, "[w]e are not inclined to readily find plain error in testimony to which the opposing party did not object."[29] Even when a question or answer is arguably improper, sua sponte action by the trial court may interfere with a party's trial tactics by bringing unwanted attention to the testimony.[30]

---

[24] *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

[25] *Id*.

[26] *Id*.

[27] *State v. Williams*, 282 Neb. 182, 802 N.W.2d 421 (2011).

[28] Cf. *State v. Eona*, 248 Neb. 318, 534 N.W.2d 323 (1995) (probative value of evidence of other drive-by shooting, in helping to establish motive, was not outweighed by danger of unfair prejudice).

[29] *State v. Senteney*, 307 Neb. 702, 711, 950 N.W.2d 585, 592 (2020).

[30] *In re Estate of Koetter, supra* note 4.

### (b) Prosecutorial Misconduct
### in Closing Arguments

Mabior also claims that the prosecution implied in closing arguments that Mabior was "responsible" for Thok's prior shooting and that this implication was plain error.[31] Mabior admits he did not move for a mistrial based on the prosecution's statements. However, on direct appeal, he claims the statements constituted prosecutorial misconduct, because the prosecutor knew the statements were false. The State counters that the prosecution's statements were not improper, but, rather, "accurately reflected" what Mabior himself told police about the Dallas incident.[32]

[11-13] When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct.[33] As we have observed, "prosecutorial misconduct" cannot be neatly defined but generally encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial.[34] A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct.[35]

[14,15] Then, if the appellate court concludes that a prosecutor's acts were misconduct, the court next considers whether the misconduct prejudiced the defendant's right to a fair trial.[36] Prosecutorial misconduct prejudices a defendant's right to a fair trial when the misconduct so infects the trial that the resulting conviction violates due process.[37]

---

[31] Brief for appellant at 27.

[32] Brief for appellee at 21.

[33] *State v. Malone*, 308 Neb. 929, 957 N.W.2d 892 (2021), *modified on denial of rehearing* 309 Neb. 399, 959 N.W.2d 818.

[34] *Id*.

[35] *Id*.

[36] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[37] *Id*.

Mabior points to the prosecutor's statement that the long-standing "beefs" between him and Thok were motive for the shootings. The prosecutor then stated that Mabior was present in Dallas when Thok was shot and told police that "'we kind of got into it[,]' and then about 15 minutes later, [Thok] gets shot a couple times." Mabior claims that the "clear implication" of this statement is that he was "responsible" for Thok's prior shooting.[38] Mabior also claims that the prosecution knew that such an implication was false, because according to Mabior, the State argued at the hearing on the motion in limine that "the evidence they had from the Dallas police concerning the [prior] shooting . . . did not implicate [him]," but, instead, showed that Mabior's cousin was the shooter.[39]

We do not view the prosecution's closing arguments here as constituting prosecutorial misconduct. On its face, the prosecution's statement indicates only that Thok's prior shooting occurred shortly after he and Mabior "'got into it.'" The prosecution did not state that Mabior shot Thok or caused Thok to be shot.

The prosecution's closing remarks are also not inconsistent with its argument at the hearing on Mabior's motion in limine. At that hearing, the State argued that evidence of the prior shooting was "inextricably intertwined into the story. . . . [W]e're not alleging that Mabior . . . shot [Thok] down in Dallas, but . . . there was an incident down there that led as a motive to this homicide." The prosecution's statement about motive in the closing arguments was not materially different, insofar as it described the Dallas shooting as part of a long-standing feud between Mabior and Thok, which was motive for the murders.

Mabior also maintains that the prosecution's statements "severely and unfairly prejudiced him."[40] However, because

---

[38] Brief for appellant at 28.

[39] *Id*. at 27.

[40] *Id*. at 28.

the prosecutor's remarks about the prior shooting were not improper, we need not address the second part of the prosecutorial misconduct analysis, regarding whether a substantial right was affected.

In light of the foregoing, we find no plain error with respect to the prosecution's closing remarks about Thok's prior shooting.

### (c) Prosecution Vouching for Law
### Enforcement and Investigation

Finally, Mabior assigns as plain error that the prosecution repeatedly "align[ed]" itself with law enforcement, thereby vouching for law enforcement's credibility and for the investigation.[41] Mabior admits that he did not object to the pertinent statements at trial or move for a mistrial or a new trial. However, he claims that the statements constituted prosecutorial misconduct. The State, in turn, argues that the statements were not improper or, alternatively, did not prejudice Mabior's right to a fair trial.

As explained above, in assessing allegations of prosecutorial misconduct based on prosecutorial remarks, an appellate court first determines whether the remarks were improper.[42] Then, if the court concludes that the remarks were improper, it next considers whether the remarks had a prejudicial effect on the defendant's right to a fair trial.[43]

[16,17] Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.[44] In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence

---

[41] *Id*. at 47.

[42] See *Malone, supra* note 33.

[43] See *id*.

[44] *Figures, supra* note 36.

the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction. [45]

Mabior points to approximately 30 instances where the prosecution used the term "we" when questioning OPD officials, as well as one instance where the prosecution referred to "my detectives" in closing arguments. We agree with the State that in several of those instances, the term "we" apparently encompassed everyone in the courtroom, not just law enforcement. We generally would not view such statements as constituting prosecutorial misconduct, even if they are a questionable practice. However, other statements could have been construed to suggest that the prosecution and law enforcement were jointly involved in the investigation. For example, in one instance, the prosecutor asked: "So we're documenting this simply because . . . we're trying to preserve the scene the best we can. We might not get another shot of it, right?" Other courts have found that similar statements can "violate[] the principles upon which both the rule against prosecutorial vouching and the advocate-witness rule are based," because they suggest that the prosecutor has personal knowledge of events and serves as a witness to them. [46] There is also the risk that the prestige and prominence of the prosecutor's office may unduly influence the jury. [47]

However, even assuming without deciding that the statements in this case implying the prosecution shared in the investigation were improper, they did not prejudice Mabior's right to a fair trial when considered within the context of the trial as a whole. The State apparently does not dispute Mabior's claims that the remarks were uninvited and that

---

[45] *Id.*

[46] *U.S. v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998). See, also, *U.S. v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002); *U.S. v. Lizarraga-Cedano*, 191 Fed. Appx. 586 (9th Cir. 2006).

[47] *Edwards, supra* note 46.

the district court provided no curative instruction. However, Mabior did not request a curative instruction, and we are reluctant to readily find plain error where the opposing party did not object at trial, as we stated above.[48] Mabior also argues that the remarks were extensive. But even if we were to agree that approximately 30 usages of "we" and "my" over a 5-day trial were extensive,[49] the remarks did not tend to mislead or unduly prejudice the jury.

The court properly instructed the jury that lawyers' statements and arguments are not evidence and that the jury alone decides the credibility of witnesses. Similarly, in closing arguments, the prosecution expressly included law enforcement when discussing the instruction that the jury is the sole judge of witnesses' credibility and the weight to be given to their testimony, stating:

> [T]he reason I think this is incredibly important is because we had several lay witnesses. We also had several witnesses who worked both for the [OPD] and for the crime lab. . . . You get to weigh and judge the credibility of each witness that's up there.[50]

Also, strong evidence supported Mabior's convictions. Mabior argues that three of the instances of alleged vouching, in particular, involved the "most critical evidence," the "interpretation of [the] identi[t]ies of the individuals in the surveillance video."[51] We disagree. As the State observes, the "primary evidence"[52] in this case was the surveillance

---

[48] See *Senteney, supra* note 29.

[49] Cf. *Hermanek, supra* note 46, 154 F.3d at 1102 (prosecutors' use of "we" and related terms on at least 19 occasions during 3 days of closing argument was "not so numerous").

[50] Cf. *Lizarrago-Cedano, supra* note 46, 191 Fed. Appx. at 588 ("government adequately set the record straight" in closing argument, where prosecutor stressed he was distinct from law enforcement).

[51] Brief for appellant at 49.

[52] Brief for appellee at 22.

video showing the actual crimes; the testimony of the witness who drove the black Honda Civic from the scene of the shootings that Mabior was the last person to get into that vehicle after she heard gunshots and that she heard Mabior say something like "'They're gone'"; the evidence of a longstanding feud between Mabior and Thok; Mabior's statements in his interviews with law enforcement; and the casings found at the scene that were of the same brand and caliber as the ammunition in the extended magazine. None of that evidence implicated law enforcement's credibility. Instead, in many of the instances where the prosecution used "we" or "my," including the three instances of particular concern to Mabior, the prosecution was apparently attempting to explain to the jury law enforcement procedures that do not "go to the heart of" this case, such as putting up evidence markers and taking photographs.[53]

As such, we find no plain error with respect to the prosecution's use of the terms "we" and "my" when referring to law enforcement and the investigation.

## 2. Mabior's Claims of Ineffective Assistance of Trial Counsel

In addition to his assertions of plain error, Mabior claims, restated and reordered, that trial counsel was ineffective in (1) failing to move to suppress a photograph of a receipt for an extended magazine that was found on Mabior's cell phone; (2) failing to move to suppress an extended magazine found in a vehicle in which Mabior was a passenger; (3) failing to move to suppress statements made in Mabior's first interview with law enforcement; (4) failing to move to suppress statements made in Mabior's second interview with law enforcement after Mabior allegedly invoked his right to remain silent; (5) failing to object to officers' narration of the surveillance

---

[53] *Hermanek, supra* note 46, 289 F.3d at 1102. See, also, *Lizarrago-Cedano, supra* note 46 (usages of "we" and "us" not going to heart of case).

video; (6) failing to object in order to request a hearing under *Rocha*[54] and exclude statements about Mabior's credibility and guilt made by officers in the context of recorded interviews with Mabior that were played for the jury at trial or admitted into evidence; (7) failing to object to evidence that allegedly implicated Mabior in Thok's prior shooting; (8) failing to object to the prosecution's aligning itself with law enforcement as the same body by vouching for law enforcement and the investigation; (9) failing to object to an officer's testimony about text messages exchanged between Thok and Deng about the party; (10) failing to object to an officer's testimony that an eyewitness told him Mabior was wearing a red hoodie on the night of the shootings; (11) failing to object to an officer's testimony that Dilang Dat told him there was one shooter, who went through the victims' pockets; (12) failing to object to a witness' testimony that she was afraid to cooperate with police and testify; and (13) failing to move for a mistrial based on the prosecution's alleged implication in closing arguments that Mabior was "responsible" for Thok's prior shooting.

Before turning to these individual claims, some of which are consolidated in the discussion below, we first review the well-established legal framework governing claims of ineffective assistance of counsel.

[18,19] When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[55] However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved.[56] The determining factor is whether the record is

---

[54] *Rocha, supra* note 1.

[55] *State v. Wheeler, ante* p. 282, 989 N.W.2d 728 (2023).

[56] *Id.*

sufficient to adequately review the question under the standard previously noted.[57]

[20-23] Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[58] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[59] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[60] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[61] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[62] A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either.[63]

### (a) Not Moving to Suppress Photograph of Receipt for Extended Magazine

Mabior claims that his trial counsel was ineffective in failing to move to suppress the photograph of the receipt for an extended magazine that was found on his cell phone. Mabior claims that the search that resulted in the discovery of the receipt was unlawful because "there is no indication from the record that law enforcement . . . obtain[ed] a search warrant for [his] cell phone."[64] The State, however, observes that

---

[57] *Id.*

[58] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[59] *Thomas, supra* note 8.

[60] *Id.*

[61] *Id.*

[62] See *State v. Lessley*, 312 Neb. 316, 334, 978 N.W.2d 620, 637 (2022).

[63] See *State v. Ellis*, 311 Neb. 862, 975 N.W.2d 530 (2022).

[64] Brief for appellant at 63.

there was testimony at trial that "law enforcement did get a search warrant for Mabior's phone."[65]

[24] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications.[66] Here, however, there was testimony that officers were executing a search warrant on the Dodge Charger when they found Mabior's cell phone and that they "did a search warrant for the phone as well." This testimony is not contradicted by the testimony that Mabior cites from another OPD detective that it is "standard procedure" in a homicide investigation "to immediately collect all cell phones" and "[t]ry to get as much information off of them as possible." Mabior seemingly suggests that the use of the word "immediately" here implies that the searches are conducted without a warrant. That inference does not necessarily follow from the officer's statement, though, and the same officer later testified that law enforcement had a warrant to search the Dodge Charger where the cell phone was found. Unlike this officer's colleague, she was not asked whether there was a warrant to search the cell phone.

[25] Because Mabior's argument specifically concerned the alleged lack of a warrant for the search, and because the record indicates that law enforcement had warrants to search both the Dodge Charger and the cell phone, his trial counsel did not perform deficiently in failing to move to suppress the photograph of the receipt for the extended magazine on the grounds that the search was unlawful. Such a motion would have failed because the argument is meritless. As a matter of law, counsel cannot be ineffective for failing to raise a meritless argument to the trial court.[67]

---

[65] Brief for appellee at 58.

[66] *State v. Vaughn, ante* p. 167, 989 N.W.2d 378 (2023).

[67] *State v. Jaeger*, 311 Neb. 69, 970 N.W.2d 751 (2022).

Accordingly, Mabior's claim that his trial counsel was ineffective in failing to move to suppress the photograph of the receipt for the purchase of an extended magazine fails.

### (b) Not Moving to Suppress Extended Magazine and Statements in First Interview With Law Enforcement

Mabior also claims that his trial counsel was ineffective in failing to move to suppress an extended magazine found in the Chevy Cruze in which he was a passenger, as well as statements made in his first interview with law enforcement. Both the discovery of the magazine and Mabior's first interview with law enforcement followed a traffic stop whose lawfulness Mabior apparently does not challenge. However, Mabior claims that the traffic stop was unlawfully "prolonged 'beyond the time reasonably required to complete the mission of the stop'" and that law enforcement lacked probable cause to search the Chevy Cruze and arrest him.[68] Mabior apparently views the record on appeal as sufficient to make a determination on this claim, while the State argues that the record is insufficient. We agree with the State.

The record on appeal shows that the vehicle in which Mabior was a passenger was stopped for a traffic violation, that the officer who stopped the vehicle smelled a "strong odor of alcoholic beverage" on the driver, and that the officer brought in a canine to sniff the vehicle for drugs. However, the record provides few specifics about the facts and circumstances surrounding the prolongation of the traffic stop. Nor does the record indicate any potential trial strategy utilized by trial counsel in determining not to file a motion to suppress the magazine or the statements in Mabior's first interview with law enforcement. In comparable circumstances, we have found that the trial record was insufficient to determine the merits of a claim on direct appeal that counsel was ineffective

---

[68] Brief for appellant at 38 (quoting *State v. Thompson*, 30 Neb. App. 135, 966 N.W.2d 872 (2021)).

for failing to file a motion to suppress.[69] We reach the same conclusion here; the record is insufficient to address Mabior's claim that his trial counsel was ineffective in failing to move to suppress the extended magazine and the statements in his first interview with law enforcement.

### (c) Not Moving to Suppress Certain Statements in Mabior's Second Interview With Law Enforcement

Mabior similarly claims that his trial counsel was ineffective in failing to move to suppress certain statements made in his second interview with law enforcement. Mabior claims that he invoked his right to remain silent part way through the second interview and that officers violated his rights under *Miranda v. Arizona*[70] by continuing to question him after that. The State disagrees.

[26,27] The safeguards of *Miranda* ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.[71] If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.[72] However, before the police are under a duty to cease the interrogation, the suspect's invocation of the right to cut off questioning must be "'"unambiguous," "unequivocal," or "clear,"'" such that a reasonable police officer under the circumstances would understand the statement as an invocation of the *Miranda* right to remain silent.[73] "If the suspect's statement is not an '"unambiguous or unequivocal"' assertion

[69] See, e.g., *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019) (collecting cases).

[70] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[71] *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021).

[72] *Id*.

[73] *State v. Clifton*, 296 Neb. 135, 159, 892 N.W.2d 112, 132 (2017).

of the right to remain silent, then there is nothing to '"scrupulously honor"' and the officers have no obligation to stop questioning."[74]

Mabior was given a *Miranda* warning at the start of the second interview, and the parties apparently agree that the statements in question were made within the context of a "custodial interrogation" for purposes of *Miranda*.[75] They disagree over whether Mabior's statement, "I just don't wanna talk no more," invoked his right to remain silent. Mabior argues that his statement invoked his right to remain silent under *State v. Perkins*,[76] wherein we contrasted a defendant's mere silence when questioned with an express statement indicating a wish to end questioning, such as "'I don't want to talk to you.'" Mabior argues that his words were essentially equivalent to those we quoted in *Perkins* as invoking the right to remain silent. The State, in turn, cites *State v. Rogers*,[77] with the apparent implication Mabior's statement indicated either that he had finished his colloquy of events or that he desired to avoid speaking about particular topics.

We need not decide this issue, however, because even if we assume without deciding that Mabior invoked his right to remain silent and his trial counsel was deficient in failing to move to suppress the subsequent statements, the record establishes that Mabior cannot show that he was prejudiced thereby. This is because, as the State observes, "Mabior said nothing of consequence"[78] after saying, "I just don't wanna talk no more." Before making the statement allegedly

---

[74] *Id.*

[75] Cf. *Vaughn, supra* note 66, *ante* at 182, 989 N.W.2d at 393 ("'custodial interrogation'" occurs when questioning is initiated by law enforcement after person is taken into custody or otherwise deprived of freedom of action in significant way).

[76] *State v. Perkins*, 219 Neb. 491, 495, 364 N.W.2d 20, 24 (1985).

[77] *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[78] Brief for appellee at 57.

invoking his right to remain silent, he had already stated that he confronted Thok in the street outside the party for taking his cell phone, that only he patted down the victims, and that the vehicle in which he left the scene of the shootings had to stop so that he could get in and that Goa Dat and Dilang Dat were already in the vehicle when he got in. Also, contrary to Mabior's assertion, he made "his initial admission"[79] that he knew the magazine was in the Chevy Cruze before saying, "I just don't wanna talk no more."

As to the officers' statements during the second interview, which Mabior claims included "some of the most egregious statements"[80] that he was lying and was guilty, the record also establishes that even if trial counsel was deficient in failing to seek their exclusion, Mabior cannot show that he was prejudiced thereby, as we explain below.

As a result, Mabior's claim that his trial counsel was ineffective in failing to move to suppress certain statements made in his second interview with law enforcement fails.

### (d) Failing to Object to Officers' Narration of Surveillance Video

Mabior further claims that his trial counsel was ineffective in failing to object to officers' testimony at trial interpreting the surveillance video and, in particular, their identification of persons shown on the video. He claims that the officers' statements were inadmissible under the best evidence rule, as expressed in Neb. Evid. R. 1002, Neb. Rev. Stat. § 27-1002 (Reissue 2016). Alternatively, he claims that the officers' statements were inadmissible under Neb. Evid. R. 602 and 701, Neb. Rev. Stat. §§ 27-602 and 27-701 (Reissue 2016). The State again disagrees, citing cases from other jurisdictions that have allowed "narration testimony," at least

---

[79] Brief for appellant at 57.

[80] *Id.*

under rule 701, so long as the narration does not "bleed[] into interpretation."[81]

We need not resolve this question, because even if we assume without deciding that the officers' narration of the surveillance video was inadmissible and Mabior's trial counsel was deficient in failing to object, the record establishes that Mabior cannot show that he was prejudiced thereby. A copy of the video without narration was admitted into evidence, along with a modified version of the video played at trial. Also, officers made clear that the identifications were not based on the video alone, describing the persons involved as "later identified" as Thok or Deng or "believed to be" Mabior, among other things. Further, the person who drove the black Honda Civic from the scene of the shootings testified that Mabior was the last person to get into that vehicle. As the State argues, the "obvious deduction" from her testimony, in combination with the surveillance video, was that Mabior shot the victims.[82]

As such, Mabior's claim that his trial counsel was ineffective in failing to object to officers' narration of the surveillance video fails.

(e) Failing to Request Hearing Under *Rocha*
and Seek to Exclude Statements Made by
Officers During Mabior's Interviews

Mabior further claims that his trial counsel was ineffective in failing to request a hearing under *Rocha*[83] and seek to exclude statements about Mabior's credibility and guilt made by officers in the context of recorded interviews with Mabior played for the jury at trial or admitted into evidence. Mabior claims that the officers' statements were irrelevant, improper opinion evidence, not probative for the purpose of

---

[81] Brief for appellee at 59.

[82] *Id*. at 60.

[83] *Rocha, supra* note 1.

providing context for Mabior's statements, and more prejudi-
cial than probative. The State counters that the officers' state-
ments were admissible under *Rocha* to provide context for
Mabior's statements in the interviews.

[28] In *Rocha*, we held as a matter of first impression that
statements by law enforcement officials on the veracity of the
defendant or other witnesses, made within a recorded interview
played for the jury at trial, are to be analyzed under the ordi-
nary rules of evidence.[84] Such commentary is not admissible
to prove the truth of the matter asserted.[85] However, it may be
independently admissible for the purpose of providing neces-
sary context to a defendant's statements in the interview which
are themselves admissible.[86]

To determine whether a statement by a law enforcement
official in a recorded interview is relevant for purposes of
providing context to a defendant's statement, we first con-
sider whether the defendant's statement itself is relevant,
whether it makes a material fact more or less probable.[87] If the
defendant's statement is itself relevant, then we must consider
whether the law enforcement statement is relevant to provide
context to the defendant's statement.[88] To do this, we consider
whether the defendant's statement would be any less probative
in the absence of the law enforcement statement.[89] If the law
enforcement statement does not make the defendant's state-
ment any more probative, it is not relevant.[90]

We agree with the State that the detective's statement in
Mabior's first interview that Mabior and another witness had

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] See *id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

different stories did not implicate *Rocha*, because the detective did not comment on Mabior's credibility.

As to the detectives' other statements, even assuming without deciding that Mabior's trial counsel was deficient in failing to request a hearing under *Rocha* and seek to exclude these statements, the record establishes that Mabior cannot show that he was prejudiced thereby. The evidence in question was cumulative of other evidence of Mabior's credibility and guilt. Even if the officers' statements that Mabior was lying had been excluded, there would still have been evidence of Mabior's inconsistent versions of his involvement in the shootings. Also, the jury could compare Mabior's versions of events to the surveillance video and the testimony of the witness who drove the black Honda Civic from the scene when assessing Mabior's credibility. Similarly, as to guilt, there were Mabior's own statements in his interviews with law enforcement, the surveillance video, the evidence regarding the extended magazine, and the testimony of the witness who drove the black Honda Civic from the scene.

Accordingly, Mabior's claim that his trial counsel was ineffective in failing to request a hearing under *Rocha* and seek to exclude statements made by officers during his interviews fails.

Mabior also claims that if the jury was allowed to hear some or all of law enforcement's statements, those statements should have been accompanied by a limiting instruction. In *Rocha*, we stated that upon request, the defendant is entitled to a limiting instruction that such statements are to be considered only for the permissible purpose of providing context to the defendant's statements in the interview.[91] However, Mabior did not specifically assign that his trial counsel was ineffective in failing to request a limiting instruction under *Rocha*; instead, he assigned that his trial counsel was

---

[91] *Id*.

ineffective in failing to request a hearing and seek to exclude officers' statements.[92]

### (f) Failing to Object to Evidence
### of Prior Shooting

Mabior further asserts that his trial counsel was ineffective in failing to object to the "testimony of [the] State's witnesses that contained out of court statements implicating" him in Thok's prior shooting.[93] Mabior assigns that these statements are hearsay and irrelevant and that they violate the Confrontation Clause. The State takes a different view and also observes that Mabior did not specifically argue that the statements were irrelevant when discussing this claim of ineffective assistance of trial counsel in his brief on appeal.

[29,30] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[94] Hearsay is not admissible unless otherwise provided for in the Nebraska Evidence Rules or elsewhere.[95] However, by definition, an out-of-court statement is not hearsay if the proponent offers it for a purpose other than proving the truth of the matter asserted.[96] Thus, statements are not hearsay to the extent that they are offered for context and coherence of other admissible statements, and not for "'the truth or the truth of the matter asserted.'"[97] Similarly, statements are not hearsay if the proponent offers them to show their impact

---

[92] *Vaughn, supra* note 66 (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

[93] Brief for appellant at 58.

[94] *Vaughn, supra* note 66.

[95] *Id*.

[96] *Id*.

[97] *Id*. at 188, 989 N.W.2d at 396 (quoting *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021)).

on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statements is relevant to an issue in the case.[98]

The record establishes that Mabior's counsel was not deficient in not objecting to the statements regarding Thok's prior shooting on hearsay and Confrontation Clause grounds, because these statements were not hearsay. The statements in question were not offered to prove that Mabior was "responsible" for Thok's prior shooting.[99] Instead, as the State argues, they were offered for context and for their effect on the listener. Specifically, they were offered to explain why law enforcement identified Mabior as a suspect. The statements also raised no Confrontation Clause issues, because they were not hearsay.[100] Even if the statements were testimonial, as Mabior argues, the Confrontation Clause does not "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[101]

As to relevancy, the State is correct that while Mabior specifically assigned that his trial counsel was ineffective in failing to object to these statements on the grounds that they were irrelevant, he did not specifically argue that in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[102]

Therefore, Mabior's claim that his trial counsel was ineffective in failing to object to evidence of Thok's prior shooting fails.

---

[98] *Id.*

[99] See brief for appellant at 29.

[100] *Vaughn, supra* note 66, *ante* at 190, 989 N.W.2d at 397 ("'[a] statement that is not hearsay raises no Confrontation Clause concerns'") (quoting *Barrett v. Acevedo*, 169 F.3d 1155 (8th Cir. 1999) (en banc)).

[101] *Crawford v. Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[102] *Vaughn, supra* note 66.

### (g) Failing to Object to Prosecution's
### "Vouching" for Law Enforcement

Mabior also assigns that his trial counsel was ineffective in failing to object or to move for a mistrial or for a new trial in response to the prosecution's repeatedly aligning itself with law enforcement, thereby vouching for law enforcement's credibility and for the investigation. Mabior argues that this was prosecutorial misconduct. The State disagrees.

For the reasons previously discussed, the record establishes that Mabior's counsel did not perform deficiently in failing to object to the prosecution's use of "we" and "my" when referring to law enforcement and the investigation, because this was not prosecutorial misconduct. However, even assuming that the statements were prosecutorial misconduct and that Mabior's counsel was deficient in failing to object or move for a mistrial or for a new trial, the record establishes that Mabior cannot show that he was prejudiced thereby. Mabior claims that the evidence against him was "largely circumstantial, relying heavily upon law enforcement to provide significance to the minimal evidence presented."[103] However, as was previously explained, the primary evidence against Mabior was the surveillance video showing the actual crimes; the testimony of the witness who drove the black Honda Civic from the scene of the shootings that Mabior was the last person to get into that vehicle after she heard gunshots and that she heard Mabior say something like "'They're gone'"; the evidence of a longstanding feud between Mabior and Thok; Mabior's statements in his interviews with law enforcement; and the casings found at the scene that were of the same brand and caliber as the ammunition in the extended magazine. None of that evidence implicated the prosecution's statements allegedly vouching for the credibility of law enforcement or the investigation. As such, Mabior's claim that his trial counsel was ineffective in failing to object or move for a mistrial or for a

---

[103] Brief for appellant at 50.

new trial based on the prosecution's alleged vouching for law enforcement fails.

### (h) Failing to Object to Testimony About Victims' Text Messages

Mabior similarly claims that his trial counsel was ineffective in failing to object to testimony by an OPD sergeant about text messages that Thok and Deng exchanged about the party. The substance of the messages was that Thok and Deng would be "'cool'" in attending the party without firearms, because, in the sergeant's words, "'We ain't hanging out with African bros.' or 'Africans bro.'" Mabior claims that the sergeant's statements about the text messages were hearsay because they were offered to prove that Thok and Deng went to the party unarmed and that they "needed firearms to protect themselves from Africans."[104] Mabior is of African descent. The State apparently does not contest that the statements were hearsay.

[31] However, even assuming that Mabior's trial counsel was deficient in failing to object to the sergeant's testimony about the victims' text messages, the record establishes that Mabior cannot show that he was prejudiced thereby. The sergeant's testimony that the victims were unarmed was cumulative of other evidence. There was testimony from at least six separate witnesses that no firearms were found at the scene of the shootings or on Thok's and Deng's persons. The erroneous admission of evidence is generally harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[105]

Similarly, as to whether the victims "needed firearms to protect themselves from Africans,"[106] we agree with the

---

[104] *Id.* at 56.

[105] *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018).

[106] Brief for appellant at 56.

State that the statements were "too broad to implicate Mabior as the shooter."[107] There was uncontroverted testimony at trial that "all the individuals involved are from the Sudanese community."

Thus, Mabior's claim that his trial counsel was ineffective in failing to object to testimony about the victims' text messages fails.

### (i) Failing to Object to Testimony About Mabior's Clothing

Mabior also asserts that his trial counsel was ineffective in failing to object to testimony by an OPD detective that a person who attended the party told him Mabior was wearing a red hoodie that night. Mabior claims that this statement was hearsay, introduced to prove he was the "person in red" who can be seen shooting one of the victims on the surveillance video.[108] Mabior similarly claims that the statement was testimonial and implicated his rights under the Confrontation Clause. The person who made this statement to the detective testified at trial but was not asked about Mabior's clothing. The State counters that the statement is not hearsay.

The record establishes that Mabior's counsel was not deficient in failing to object to the detective's testimony about the red hoodie on hearsay and Confrontation Clause grounds, because the statement was not hearsay. The testimony in question was part of the detective's description of his actions after Mabior's first interview. Mabior was released at the end of that interview. However, the detective explained that after Mabior's release, an "[i]nterview was conducted with another witness" that prompted officers to contact Mabior again. The prosecutor then asked the detective, "Why did you go and make contact with . . . Mabior after interviewing [this other witness]?" The detective stated: "[The witness] was able to tell us that [Mabior] was wearing a red hoodie that night."

---

[107] Brief for appellee at 52.

[108] Brief for appellant at 35.

The context here makes clear that the statement about the red hoodie was introduced to show its effect on the listener and not to prove that Mabior was the "person in red" depicted in the surveillance video.[109] As explained above, statements are not hearsay if the proponent offers them to show their impact on the listener, and the listener's knowledge, belief, response, or state of mind after hearing the statement is relevant to an issue in the case.[110] Such was the case here. The statement was introduced to show the detective's response to it; after learning that Mabior was wearing a red hoodie on the night of the shooting, officers arranged for him to be brought in for a second interview.

Insofar as the statement was not hearsay, it "'raises no Confrontation Clause concerns,'"[111] as explained above.

Therefore, Mabior's claim that his trial counsel was ineffective in failing to object to the detective's statement that a witness told him Mabior was wearing a red hoodie fails.

### (j) Failing to Object to Testimony That There Was One Shooter Who Went Through Victims' Pockets

Mabior likewise asserts that his trial counsel was ineffective in not objecting on hearsay and Confrontation Clause grounds to the detective's testimony that Dilang Dat told him there was one shooter who went through the victims' pockets. Dilang Dat did not testify at the trial. The State apparently does not dispute that the testimony was hearsay and violated Mabior's rights under the Confrontation Clause, but the State argues that Mabior cannot show he was prejudiced thereby.

We agree with the State. Even assuming that Mabior's trial counsel was deficient in failing to object to the detective's

---

[109] See *id.*

[110] *Vaughn, supra* note 66 (officer's testimony about Amtrak employee's statement that luggage belonged to defendant not hearsay because it was offered for context and coherence and to show impact on officer).

[111] *Id.* at 190, 989 N.W.2d at 397.

testimony that there was one shooter who went through the victims' pockets, the record establishes that Mabior cannot show that he was prejudiced thereby, because the detective's testimony was cumulative of other testimony.

As to there being one shooter, the record shows that all eight of the 9-mm casings recovered at the scene were fired from the same firearm. These casings were of the same caliber and brand as the ammunition contained in the extended magazine found on the passenger-side floorboard of the Chevy Cruze in which Mabior was a passenger. Mabior's cell phone also contained a photograph of a receipt for the purchase of an extended magazine for a 9-mm firearm by his girlfriend. In addition, the person who drove the black Honda Civic from the scene of the shootings testified that she heard multiple gunshots while waiting in the vehicle, "all [of which] sounded like it was the same gun."

Similarly, as to the shooter's going through the victims' pockets, Mabior himself stated in his second interview with law enforcement, before making the statements allegedly invoking his right to remain silent, that he patted down the victims and that no one else patted down the victims. The surveillance video also shows a person bending over Deng's body, apparently looking for something.

Accordingly, Mabior's claim that his trial counsel was ineffective in failing to object to the detective's testimony that an eyewitness said there was one shooter who went through the victims' pockets fails.

### (k) Failing to Object to Testimony About Fear of Retaliation

Mabior also asserts that his trial counsel was ineffective in failing to object on relevance and rule 403 grounds to a witness' testimony about her fear of retaliation if she came forward. The State counters that the evidence was relevant and not unfairly prejudicial.

We agree with the State that the record establishes trial counsel did not perform deficiently in failing to object on relevance and rule 403 grounds. Mabior cites *State v. Iromuanya*[112] for the proposition that, in his words, "when a witness is threatened or intimidated by the defendant, the witness['] testimony about being fearful of coming forward is admissible to show 'consciousness of guilt.'"[113] He maintains that under this standard, testimony about the witness' fear of coming forward in this case was "clearly inadmissible" to show his consciousness of guilt, because there was no evidence he threatened or intimidated the witness or caused her to be threatened or intimidated.[114]

However, our discussion of relevance in *Iromuanya* was not limited to evidence of the defendant's consciousness of guilt. Instead, we found that the fact that the witness was afraid of the defendant's friends was separately relevant to the "issue of [the witness'] credibility," as well as to the "jury's evaluation of which of [the witness'] versions of events to believe."[115]

[32] The evidence of the witness' fear in this case is relevant for the same reasons as in *Iromuanya.* The credibility of a witness is always relevant, as Nebraska and other courts have found.[116] However, in this case, in particular, the prosecution may have anticipated questions about the witness' credibility and opted to address them on direct examination, including through questions about her fear of potential consequences

---

[112] *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006).

[113] Brief for appellant at 54.

[114] *Id*. at 55.

[115] *Iromuanya, supra* note 112, 272 Neb. at 191, 719 N.W.2d at 279.

[116] See, e.g., *In re Interest of Kyle O.*, 14 Neb. App. 61, 703 N.W.2d 909 (2005); *State v. Eldred*, 5 Neb. App. 424, 559 N.W.2d 519 (1997). See, also, *Saxton v. Commonwealth*, No. 2021-SC-0353-MR, 2022 WL 17726197 (Ky. Dec. 15, 2022); *Margerum v. People*, 454 P.3d 236 (Colo. 2019); *Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002); *Mills v. Grotheer*, 957 P.2d 540 (Okla. 1998); *Smith v. State*, 273 Md. 152, 328 A.2d 274 (1974).

or retaliation if she came forward.[117] The witness here had charges pending against her related to the shootings and, like the witness in *Iromuanya*, changed her version of events over time. Mabior is correct that the witness never stated that he threatened her or caused her to be threatened. However, the fact that the fear was caused by third parties, not Mabior, does not necessarily make testimony about the witness' fear irrelevant as to the witness' credibility and which of her versions of events to believe.[118] The witness in *Iromuanya* did not testify that she was afraid of the defendant specifically; rather, she testified that she was afraid that "somebody, 'maybe some of [the defendant's] friends,' would do something to her."[119]

Here, the witness testified that while she was not "threatened . . . in any manner personally" or told not to talk to police, her boyfriend, Dilang Dat, and his brother, Goa Dat, "insinuated" or "led [her] to believe" that she should not talk to police. She also testified that Dilang Dat was friends with Mabior. This testimony apparently underlies Mabior's argument that the witness' testimony was unfairly prejudicial to him because the "clear implication of this line of testimony [was] to insinuate" that he, through his friends, attempted to intimidate and prevent the witness from talking to police or testifying.[120] We disagree. Based on the witness' testimony, it was equally plausible, as the State suggests, that Goa Dat and Dilang Dat wanted her to keep silent for their own reasons. The witness expressly testified that their suggestions that she keep quiet made her feel like they "were hiding something" or "had some involvement."

---

[117] See, e.g., *United States v. LeFevour*, 798 F.2d 977 (7th Cir. 1986).

[118] See, e.g., *People v. Mendoza*, 52 Cal. 4th 1056, 1084, 132 Cal. Rptr. 3d 808, 835, 263 P.3d 1, 24 (2011) (evidence of third party threat may bear on credibility of witness, whether or not threat is "directly linked" to defendant).

[119] *Iromuanya, supra* note 112, 272 Neb. at 189, 719 N.W.2d at 278.

[120] Brief for appellant at 54.

As such, Mabior's claim that his trial counsel was ineffective in failing to object to testimony about a witness' fear of retaliation if she came forward is meritless.

### (l) Failing to Move for Mistrial Based on Implication That Mabior Was "Responsible" for Prior Shooting

Finally, Mabior argues that his trial counsel was ineffective in failing to move for a mistrial based on the prosecutor's misconduct in implying that he was "responsible" for Thok's prior shooting.[121] The record refutes this contention. For the reasons previously explained, the prosecutor's statements about the prior shooting were not misconduct. As such, Mabior's claim that his trial counsel was ineffective for failing to move for a mistrial on this basis fails.

### 3. State's Assertion of Plain Error

[33] The State asserts that the district court committed plain error in sentencing Mabior to "life without the possibility of parole," also stated as "[l]ife, with no parole," for each conviction of first degree murder. We agree that the district court committed plain error here. Mabior was convicted of two Class IA felonies.[122] Under § 28-105, a Class IA felony is punishable by life imprisonment, but that statute does not authorize a sentence of life imprisonment without the possibility of parole.[123] Therefore, a sentence of life imprisonment "without the possibility of parole" is erroneous, but not void.[124] We therefore modify the sentencing order to reflect a sentence of life imprisonment for each of Mabior's convictions for first degree murder.

---

[121] *Id.* at 29.

[122] § 28-303.

[123] *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

[124] *Id.*

## VI. CONCLUSION

For the reasons stated herein, the record on direct appeal is insufficient to address several of Mabior's ineffective assistance of counsel claims on direct appeal. Otherwise, finding no merit to the arguments raised, we affirm Mabior's convictions and sentences as modified to correct plain error in the sentences for his convictions for first degree murder. The sentencing order shall be modified to state that Mabior is sentenced to life imprisonment for each conviction for first degree murder.

AFFIRMED AS MODIFIED.

CASSEL, J., concurring.

Although I join the court's opinion in full, I write separately to address the issue of the prosecution's vouching for law enforcement's credibility and for the investigation.

Here, the vouching issue is presented solely as an issue of plain error. Bearing in mind that an appellate court will generally find plain error "only when a miscarriage of justice would otherwise occur,"[1] I have considerable doubt that vouching could ever rise to that level.[2] But in a proper case, where a prosecutor insists on engaging in such conduct and proper objections are made, reversal could be appropriate.

HEAVICAN, C.J., and MILLER-LERMAN, J., join.

---

[1] *State v. Childs*, 309 Neb. 427, 436, 960 N.W.2d 585, 594 (2021).

[2] See, e.g., *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016) (finding that even if prosecutor's statements were misconduct, statements were not prejudicial and certainly did not amount to plain error).